**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GUILLERMO ROLANDO CHIPOCO,** | : | **Civil No. 1:21-cv-1154** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security[1],** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

## I.   Introduction

This Social Security appeal aptly illustrates the challenges which Administrative Law Judges face when attempting to address *pro se* litigant claims, as well as the perils of proceeding without counsel in this complex and highly technical field. The plaintiff, Guillermo Chipoco, who is representing himself in this case, and was required to represent himself at the agency hearing when his counsel withdrew one day before that hearing, appeals an Administrative Law Judge (ALJ)

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g) Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

decision which found that he retained the capacity to perform a narrow range of light work. (Tr. 36).

Unaided by counsel, Chipoco presented his case to the ALJ in an unclear and inexpert fashion. Nonetheless the ALJ assigned to Chipoco's case endeavored to assist the plaintiff by securing more than 1,200 pages of medical evidence relating to his condition. (Tr. 356-1588). These were commendable efforts by the ALJ, who should be applauded for helping this *pro se* litigant in this fashion.

However, having secured these voluminous records, the ALJ was now tasked with analyzing the records. Moreover, when it came to evaluating these extensive medical records, the ALJ received only minimal guidance and assistance from Chipoco, who in turn was unassisted by counsel. Left to this task without any real guidance or assistance, the ALJ summarily dismissed two medical source statements from treating and examining physicians, both of whom stated that Chipoco's impairments were disabling. (Tr. 583-611, 631-34). The ALJ discounted these medical source statements based solely upon the conclusion that these detailed statements did not constitute "an opinion" under the Commissioner's regulations. (Tr. 42). Thus, neither medical source statement was evaluated on its merits.

We appreciate the very difficult position which the inexpert presentation of this case created for the ALJ. However, when assessing medical opinion evidence it

2

is axiomatic that "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" <u>Morales v. Apfel,</u> 225 F.3d 310, 317 (3d Cir. 2000) (quoting <u>Plummer v. Apfel</u>, 186 F.3d 422, 429 (3d Cir. 1999)). In this case we conclude that these statements were medical opinions as that term is defined in the Commissioner's regulations. We further find that it was error to discount these medical opinions in this summary fashion based upon a mischaracterization of the medical statements as something less than opinions. Rather what was required was some consideration of the underlying merits of these opinions. Therefore, we will remand this case for further consideration by the Commissioner.

## II.   <u>Statement of Facts and of the Case</u>

### A. <u>Procedural Background</u>

According to the administrative record, this is the plaintiff's third Social Security disability application. Mr. Chipoco previously applied for benefits on January 7, 2010 and March 6, 2014. (Tr. 88, 344). Chipoco's 2010 application was denied after reconsideration without appeal by the plaintiff. (<u>Id</u>.) Chipoco's 2014 application was denied initial and on reconsideration. Chipoco then requested a hearing but allegedly never received notice of that hearing, leading to the dismissal of the application. (<u>Id</u>.)

On January 31, 2019, Chipoco filed the instant claim for benefits under Titles II and XVI of the Act. (Tr. 32, 208-18, 219-223). In these applications Chipoco identified the date of onset for his disability as April 1, 2010. (Id.) Chipoco met the insured status requirements of the Social Security Act through December 31, 2015. (Tr. 35).

According to Chipoco, he had become disabled due to the combined effects of an array of impairments, including degenerative disc disease of the lumbar spine with radiculitis and radiculopathy, status post discectomy at L4-5 and L5-S1, failed back syndrome, sciatica, cervicalgia, chronic pain syndrome, right shoulder tendinopathy, tendinitis and bursitis, status post right shoulder arthroscopy, acromioplasty and distal clavicle resection, post-operative arthrofibrosis, hernia, right cubital tunnel syndrome, right carpal tunnel syndrome and trigger finger. (Tr. 35). Chipoco was 35 years old at the time of the alleged onset of his disability, making him a younger worker under the Commissioner's regulations. (Tr. 87). He had been employed as a union carpenter from 1997 through the summer of 2010. (Tr. 62-63).

Chipoco was initially represented by counsel in this case, which was scheduled for a hearing before an ALJ on March 19, 2020. (Tr. 54). However, on March 18, 2020, the day before the scheduled hearing, counsel withdrew from her

4

representation as a result of some apparent dispute regarding the telephonic nature of the hearing. (Tr. 204). Thus, at the last moment Chipoco was left bereft of counsel as he approached this critical stage in his administrative proceedings.

### B. Chipoco's Treatment History and Medical Opinions

Chipoco's medical history was detailed in the extensive medical record compiled in this appeal. (Tr. 356-1588). That medical history revealed that the triggering events which precipitated this disability application were a series of car accidents suffered by Chipoco in 2008 and 2011. The first of these automobile accidents took place on December 8, 2008. (Tr. 356-70). At that time emergency room records documented that Chipoco suffered a rib fracture, clavicle sprain and left shoulder sprain. (Tr. 358). MRI testing also revealed mild tendinitis and moderate bulging of a disc in his cervical spine. (Tr. 404-05).

In 2009 and 2010, Chipoco treated with Dr. Boqing Chen and Dr. John King for shoulder, neck back and leg pain which he was experiencing. (Tr. 371, 387, 388-407). These treating physicians documented increasing tenderness which Chipoco was experiencing. (Id.) Ultimately, on November 2, 2019, Chipoco underwent an arthroscopic procedure on his shoulder, (Tr. 393-97, 416-18), which reportedly provided him some shoulder symptom relief. (Tr. 392).

In 2010, Chipoco was twice evaluated by physicians to determine whether his worsening bank pain was disabling. On February 2, 2010, Dr. Mark Pitman, an examining and consulting medical source, opined that Chipoco would no longer work as a carpenter due to these impairments. (Tr. 432-34). Dr. Pitman reiterated these conclusions in a second report authored on June 22, 2011, finding that Chipoco suffered from a "Phase II disability." (Tr, 435-37). In addition, on November 20, 2010, a second medical source, a chiropractor named Dr. Glenn Collazo, also opined that Chipoco's back, neck, shoulder, and leg pain were disabling. (Tr. 422-24).

In May of 2011, Chipoco began treating with Dr. Chen with increasing frequency. (Tr. 496-505). Dr. Chen's treatment notes documented increased pain, decreased range of motion, and a mildly antalgic gait for Chipoco. (Id.) On July 13, 2011, these conditions were exacerbated when Chipoco experienced a second motor vehicle accident. Emergency room records from this second accident disclosed that Chipoco experienced no bone fractures but identified a cervical strain suffered by Chipoco. (Tr. 480-91).

In the wake of this second accident, Chipoco's treating physicians adopted a more aggressive approach to the treatment of these chronic neck, shoulder, back and leg conditions. On August 25, 2011 Dr. Chen conducted a lumbar discography in order to "elucidate" the cause of Chipoco's severe back pain. (Tr. 537-38). One

6

month later, on September 29, 2011, Dr. Chen and another treating physician, Dr.

Marc Cohen, performed a lumbar discectomy procedure on Chipoco. (Tr. 556-58).

In March of 2012, Dr. Chen then followed up with a spinal epidural procedure in

order to try to provide Chipoco with further relief. (Tr. 576-77).  Despite these

medical interventions, Chipoco continued to complain of disabling back pain and

medical treatment records post-dating his date last insured further documented his

on-going and severe spinal impairments, while reaching some contradictory views

regarding the gravity of these conditions.

As the ALJ observed on this score:

MRI of the lumbar spine done on June 23, 2016 confirmed degenerative
disc disease (Exhibits B29F/pages 7 and 9, B30F/page 2 and B46F/page
37). X-ray of lumbar spine done on September 23, 2016 showed mild
DDD and left hip SI joint (Exhibit 29F).

A neurological examination on August 8, 2016 disclosed an antalgic
gait on the left. Diagnoses were left sacroiliitis and post-laminectomy
syndrome (Exhibit B46F/ pages 59 and 77). Multiple sources diagnosed
failed back syndrome (Exhibits B26F and B35F).

X-ray of the lumbar spine done on December 7, 2019 showed mild
dextroscoliosis and mild degenerative disc disease (Exhibit B31F).
MRI of the lumbar spine performed on December 23, 2019 confirmed
degenerative disc disease and stenosis (Exhibits B34F, B36F/ pages 6
and 7, B45F/page 29). An EMG of the lower extremities on January 22,
2020 revealed chronic left sided radiculopathy (Exhibits B37F and
B46F/page 84).

Dr. Allister Williams conducted an orthopedic evaluation of the
claimant on January 3, 2020 (Exhibit B38F). Physical examination was

within normal limits. Dr. Williams diagnosed lumbar radiculopathy. Discussions were had with the claimant regarding the possibility of anterior lumbar internal fixation or further injections but the claimant indicated that he was unsure he wanted to proceed with either of these options.

An EMG of the lower extremities on January 20, 2020 confirmed chronic left L5 radiculopathy (Exhibit B37F).

An orthopedic evaluation by Dr. John Kerrigan on February 3, 2020 revealed normal physical examination. He diagnosed failed back syndrome and left sided sciatica (Exhibit B42F).

(Tr. 41).

During the course of his extensive treatment, a number of medical sources have opined regarding the degree to which Chipoco's shoulder, neck, back, and leg pain was disabling. These medical sources have reached differing conclusions on this question, although many of the treating, consulting, and examining doctors have stated that Chipoco's condition is disabling.

For example, on February 2, 2010, Dr. Mark Pitman, an examining and consulting medical source, opined that Chipoco would no longer work as a carpenter due to these impairments. (Tr. 432-34). Likewise on November 20, 2010, a second medical source, Dr. Glenn Collazo, also opined that Chipoco's back, neck, shoulder, and leg pain were disabling. (Tr. 422-24). Dr. Chen, a treating source, stated in June of 2011 that Chipoco could not return to his prior work as a carpenter. (Tr. 503). Additionally, Dr. David Stein, a certified vocational rehabilitation counselor, opined

in June 28, 2011 that Chipoco could not return to his prior employment and was totally disabled. (Tr. 439-57). In contrast to this medical consensus, Dr. Andrew Willis, a physician who examined Chipoco in August of 2011, concluded that he could work full duty with no restrictions due to his prior shoulder injuries. (Tr. 1569-73).

State agency experts who examined Chipoco's treatment records reached similarly equivocal and somewhat conflicting opinions regarding the degree to which these impairments were disabling. Initially, two state agency experts, Dr. Minda Bermudez and Dr. Toni Parmalee, opined that the medical record was insufficient to allow them to reach any conclusions on this question. (Tr. 87-107). Later, however, Dr. Parmalee opined based on additional evidence that Chipoco condition had worsened over time, but that he could still perform a limited range of light work. (Tr. 111-28).

These medical opinions which suggested that Chipoco could work were contradicted, however, by two other treating, examining and consulting source opinions which were never fully considered by the ALJ in rendering this decision. On March 27, 2012, Dr. Mitchell Steinway, a consulting and examining source, prepared a detailed report, (Tr. 605-10), describing the extent of Chipoco's impairment. As described by Dr. Steinway, this report drew upon detailed review of

Chipoco's treatment records as well as the doctor's own examination of the plaintiff. (Id.) Based upon this analysis, Dr. Steinway first opined that Chipoco could no longer engage in carpentry work. (Tr. 609). The doctor further stated that he now believed Chipoco to be "totally and permanently disabled." (Id.) In reaching this determination, Dr. Steinway also was able to specifically ascribe degrees of this disability to Chipoco's various medical conditions, stating that this disability resulted 35% from Chipoco's shoulder impairment, 50% from his lumbar conditions, and 15% from his cervical spine and antalgic gait issues. (Id.)

Dr. Steinway's opinions were then echoed by a second, treating source, Dr. Marc Cohen, who provided a medical opinion letter on May 1, 2012, which also concluded that Chipoco was totally disabled. (Tr. 631-34). Dr. Cohen's medical opinion detailed at length the physician's treatment history with Chipoco. (Id.) According to Dr. Cohen Chipoco's second auto accident in July of 2011 "caused an exacerbation and worsening of [his] preexisting conditions that warranted" spinal surgery. (Tr. 633). Notwithstanding this surgery, from Dr. Cohen's treating perspective, Chipoco's "back injuries from both accidents are disabling. He should not do any work which requires repetitive bending, lifting or prolonged standing." (Id.)

It is against this medical backdrop that the ALJ came to consider Chipoco's disability claims.

### C.   <u>The ALJ's Hearing and Decision</u>

As we have noted, Chipoco was initially represented by counsel in this case, which was scheduled for a hearing before an ALJ on March 19, 2020. (Tr. 54). However, on March 18, 2020, the day before the scheduled hearing, counsel withdrew from her representation as a result of some apparent dispute regarding the telephonic nature of the hearing. (Tr. 204).

The following day, May 19, 2010, Chipoco proceeded to his disability hearing without the benefit of counsel. (Tr. 54-86). The ALJ began this hearing noting the withdrawal of Chipoco's counsel the day before and conducted a thorough colloquy with the plaintiff, who expressed the desire to proceed with this hearing. (Tr. 57-58). The ALJ then carefully described the administrative process to Chipoco and agreed to work with this *pro se* plaintiff to assist him in securing any necessary medical records. (Tr. 59-62). The ALJ also elicited testimony from Chipoco regarding the severity of his back impairments. (Tr. 63-74). In this testimony Chipoco stated that he was severely limited in his daily activities due to intractable back pain. (<u>Id.</u>) Chipoco's account of the severity of these impairments was confirmed by his wife,

11

who also testified at this hearing. (Tr. 74-78). Finally, the ALJ received testimony from a vocational expert. (Tr. 79-85).

Notwithstanding Chipoco' waiver of counsel, in hindsight, it is evident that the plaintiff was ill-prepared to conduct these proceedings on his own. For example, when asked by the ALJ what additional evidence he wished to present, Mr. Chipoco seemed somewhat at a loss, and could only suggest that: "You can call my wife. You can call all my doctors." (Tr. 74). The understandable difficulty the plaintiff was experiencing navigating this complex legal field left the ALJ at sea amidst Chipoco's complicated medical history with few guides or guideposts. Thus, at the conclusion of this hearing, the ALJ was tasked with evaluating a voluminous and extensive medical record comprising more than 1,200 pages of material. Due to Chipoco's last minute abandonment by his counsel, the ALJ was required to undertake this task with little assistance from the claimant who was unschooled in such matters and without the aid of counsel.

On September 23, 2020, the ALJ issued a decision denying this application for benefits. (Tr. 29-45). In that decision, the ALJ first concluded that Chipoco met the insured status requirements of the Social Security Act through December 31, 2015, and had engaged in some substantial gainful activity for a few months

following the alleged date of onset, April 1, 2010 but had not worked since 2010. (Tr. 35).

At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Chipoco's degenerative disc disease of the lumbar spine with radiculitis and radiculopathy, status post discectomy at L4-5 and L5-S1, failed back syndrome, sciatica, cervicalgia, chronic pain syndrome, right shoulder tendinopathy, tendinitis and bursitis, status post right shoulder arthroscopy, acromioplasty and distal clavicle resection, post-operative arthrofibrosis, hernia, right cubital tunnel syndrome, right carpal tunnel syndrome, and trigger finger were all severe impairments. (Tr. 35). At Step 3, the ALJ determined that none of these impairments met or medically equaled the severity of one of the listed impairments. (Tr. 36).

Between Steps 3 and 4, the ALJ concluded that Chipoco retained the following residual functional capacity ("RFC"):

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a narrow range of light work (treated as sedentary work) as defined in 20 CFR 404.1567(a) and 416.967(a) except he could never use foot controls with the left lower extremity. He could frequently reach, handle, finger and feel with the bilateral upper extremities. The claimant could occasionally balance, stoop, kneel, crouch, crawl and climb on ramps and stairs but never climb on ladders, ropes or scaffolds. He could frequently operate a motor vehicle and had frequent exposure to atmospheric conditions, extreme heat, wetness and humidity. The claimant should never be exposed to vibration, cold and hazards, such as unprotected heights and dangerous moving mechanical

parts. Additionally, the claimant is limited to sitting for 5 hours in an 8-hour day, stand for 4 hours in an 8-hour day and walk for 3 hours in an 8-hour day with a sit/stand option every 30 minutes.

(Tr. 36-37).

In reaching this RFC determination, the ALJ discussed Chipoco's lengthy treatment history. (Tr. 37-41). The ALJ also evaluated the competing medical opinions, many of which described Chipoco's impairments as disabling. (Tr. 41-43). For the most part, this medical opinion analysis made determinations regarding the persuasive power of the opinions based upon an evaluation of the content of those opinions. However, in two significant instances, medical opinions were discounted by the ALJ in a cursory manner by simply declining to characterize them as opinions.

Thus, the ALJ declined to address the detailed report of the consulting and examining physician, Dr. Steinway, on its merits concluding instead that: "The finding of Dr. Mitchell Steinway (Exhibits B12F and B13F) that the claimant is permanently disabled does not constitute an opinion but has been considered in evaluating this claim." (Tr. 42). Likewise, with respect to the May 1, 2012 medical opinion expressed by Chipoco's treating physician, Dr. Marc Cohen, who also found that Chipoco was disabled, the ALJ's treatment was dismissive and was limited to the following: "The statement of Dr. Marc Cohen that the claimant is out of work from all type of duties has also been considered but is not an opinion under SSA

14

regulations (Exhibit B10F/page 1)." (Id.) This latter statement disposing of Dr. Cohen's opinion was particularly enigmatic since the ALJ's record citation simply referred to a one-page handwritten note by the doctor. (Tr. 515). Therefore, the ALJ's decision did not analyze, address, or even acknowledge the much more expansive treating source opinion set forth in Dr. Cohen's May 1, 2012 letter. (Tr. 631-34). Indeed, it is entirely unclear whether the ALJ—who was left to navigate this extensive medical record without assistance or a clear roadmap—even identified the existence of this treating source opinion.

Having reached these conclusions regarding the medical clinical and opinion evidence, the ALJ found that, although Chipoco was unable to return to his past relevant work, he could perform a "narrow range of light work (treated as sedentary work)." (Tr. 36). Guided by this finding, a finding which failed to take into account two opinions from treating, examining and consulting sources, both of whom described Chipoco as disabled, the ALJ concluded that jobs existed in significant numbers in the national economy which Chipoco could perform. (Tr. 44-45). Accordingly, the ALJ determined that Chipoco had not met the demanding showing necessary to sustain this claim for benefits and denied this claim. (Tr. 45).

This appeal followed. (Doc. 1). On appeal, Chipoco, who is proceeding *pro se*, advances an array of claims, including an assertion that the ALJ erred in the

evaluation of the medical opinion evidence. (Doc. 14). This appeal is fully briefed by the parties, (Docs. 14 and 15), and is, therefore ripe for resolution.

While we are sympathetic to the difficulty of the task thrust upon the ALJ by the sudden abandonment of Chipoco by his counsel, in our view, the failure to properly identify and analyze these two medical opinions calls for a remand of this case and further consideration of this opinion evidence.

## III.   <u>Discussion</u>

### A.   <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F.Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a

conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that [she] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F.Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the

burden of articulation demanded by the courts to enable informed judicial review.

Simply put, "this Court requires the ALJ to set forth the reasons for his decision."

Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the

Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for
> his decision. 220 F.3d at 119. Conclusory statements . . . are
> insufficient. The ALJ must provide a "discussion of the evidence" and
> an "explanation of reasoning" for his conclusion sufficient to enable
> meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d
> 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ
> particular "magic" words: "Burnett does not require the ALJ to use
> particular language or adhere to a particular format in conducting his
> analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the

ALJ's decision under a deferential standard of review, but we must also give that

decision careful scrutiny to ensure that the rationale for the ALJ's actions is

sufficiently articulated to permit meaningful judicial review.

## B.   Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a

claimant must demonstrate an inability to "engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a

19

continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett, 220 F.3d at 121 (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018); Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in

21

engaging in any of his or her past relevant work. <u>Mason</u>, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.  20 C.F.R. §§404.1512(f), 416.912(f); <u>Mason</u>, 994 F.2d at 1064.

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and state that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." <u>Biller v. Acting Comm'r of Soc. Sec.</u>, 962 F.Supp.2d 761, 778–79 (W.D. Pa. 2013) (quoting <u>Gormont v. Astrue</u>, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." <u>Titterington v. Barnhart</u>, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical

22

opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F.Supp.3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting, like that presented here, where well-supported medical sources have opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when no medical opinion supports a disability finding or when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington, 174 F. App'x 6; Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ

23

has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns, 312 F.3d 113; see also Rathbun, 2018 WL 1514383, at *6; Metzger, 2017 WL 1483328, at *5.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

### C.   Legal Benchmarks for the ALJ's Assessment of Medical Opinions

Chipoco filed his disability following a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to

March 2017, ALJs were required to follow regulations that defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court has aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).
>
> Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the

foundation of the treating source rule. <u>Revisions to Rules</u>, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." <u>Id.</u> at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." <u>Id.</u> at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. <u>Id.</u> at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). <u>Id.</u> at §§ 404.1520c(b)(3), 416.920c(b)(3).

<u>Andrew G. v. Comm'r of Soc. Sec.</u>, No. 3:19-CV-0942 (ML), 2020 WL 5848776, at

*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions.

Judicial review of this aspect of ALJ decision-making is guided by several settled

legal tenets. Foremost among these guiding tenets is the proposition that when

evaluating medical opinions " the ALJ may choose whom to credit but 'cannot reject

evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, while it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight, the ALJ must properly identify and characterize the medical opinions in the record.

On this score, the Commissioner's regulations define medical opinions broadly, as follows:

> (2) Medical opinion. A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the abilities listed in paragraphs (a)(2)(i)(A) through (D) and (a)(2)(ii)(A) through (F) of this section. (For claims filed (see § 416.325) before March 27, 2017, see § 416.927(a) for the definition of medical opinion.)
>
> (i) Medical opinions in adult claims are about impairment-related limitations and restrictions in:
>
> (A) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
>
> (B) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;
>
> (C) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and

27

(D) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

20 C.F.R. § 416.913(a). <u>See</u> 20 C.F.R. §404.1513(a).

Therefore, it follows that as part of an evaluation of a claimant's medical record, an ALJ must properly characterize medical statements as opinions when they meet the broad criteria prescribed by these regulations. Furthermore, when an ALJ mischaracterizes a medical opinion in some material respect, a remand may be required. <u>Gonzales v. Colvin</u>, 191 F. Supp. 3d 401, 420 (M.D. Pa. 2015).

It is against these legal guideposts that we assess the ALJ's decision in the instant case.

## D.   <u>This Case Will Be Remanded for Further Consideration of the Medical Opinion Evidence.</u>

We appreciate the difficulty of the task thrust upon the ALJ in this case where an ill-prepared *pro se* litigant, who was abandoned by his counsel the day before his disability hearing, may have lacked the ability to guide the ALJ through a voluminous medical record. We also recognize, and commend, the efforts of the ALJ to assist the plaintiff in presenting this claim as well as the ALJ's conscientious attempt to review this extensive medical record with few useful guideposts to aid that analysis. However, we are constrained to conclude that the ALJ's consideration

28

of the medical opinions of Drs. Steinway and Cohen was insufficient and resulted in potential prejudice to the plaintiff.

We believe that the ALJ erred in the first instance by summarily dismissing the reports of these treating, examining, and consulting sources by simply asserting that these reports were not "opinions" as that term is defined under the commissioner's regulations. (Tr. 41). For purposes of disability analysis under the Act a "medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations." 20 C.F.R. § 416.913(a); 20 C.F.R. §404.1513(a). In our view, a fair reading of the detailed reports submitted by Dr. Steinway and Dr. Cohen reveal that they are medical opinions. These reports identified and described Chipoco's diagnoses and treatment. They set forth the impairments and limitations which the doctors believed Chipoco was experiencing. Read as a whole, and in a commonsense fashion, they then described Chipoco's physical limitations, concluding that he was disabled. While one may dispute the content of these opinions, or question the degree to which the opinions are persuasive, it was error to simply disregard these reports by characterizing them as something less than what they were—medical opinions.

There was a particular peril to this course in several respects, all of which were potentially prejudicial to the plaintiff. At the outset, ALJ's conclusion that

"[t]he statement of Dr. Marc Cohen that the claimant is out of work from all type of duties has also been considered but is not an opinion under SSA regulations (Exhibit B10F/page 1)," (Tr. 42), was doubly deficient. First, this finding mischaracterized Dr. Cohen's treating source report as something less than a medical opinion, which was error.  Moreover, the ALJ's record citation in support of this finding simply referred to a one-page handwritten note by the doctor, (Tr. 515), without analyzing, addressing or even acknowledging the much more expansive treating source opinion set forth in Dr. Cohen's May 1, 2012 letter. (Tr. 631-34). Therefore, we cannot determine whether the ALJ was even aware of the much more expansive treating source opinion letter submitted by Dr. Cohen.  In the same vein, the ALJ erred when he described Dr. Steinway's March 2012 report that Chipoco was "totally and permanently disabled" which ascribed in specific detail the degrees of this disability that were attributable to Chipoco's various medical conditions, (Tr. 609), as a statement  which "does not constitute an opinion". (Tr. 42).

Furthermore, the mischaracterization and dismissal of these treating, examining, and consulting source opinions was clearly prejudicial. This prejudice is illustrated by the fact that even after the ALJ summarily discounted these opinions without evaluating them on their merits, the ALJ concluded that the remaining medical evidence compelled an extremely limited RFC for Chipoco which confined

him to "a narrow range of light work (treated as sedentary work)." (Tr. 36). A single example suffices to underscore this prejudice. The highly restrictive RFC fashioned for Chipoco still required that he be able to "stand for 4 hours in an 8-hour day and walk for 3 hours in an 8-hour day." (Tr. 37). Yet, Dr. Cohen's May 1, 2012 treating source opinion which was not identified or acknowledged by the ALJ, clearly stated that Chipoco's "back injuries from both accidents are disabling. He should not do any work which requires repetitive bending, lifting *or prolonged standing*." (Tr. 633) (emphasis added). Therefore, if this treating source restriction on prolonged standing is credited, then the current RFC likely collapses.

In sum, "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" <u>Morales,</u> 225 F.3d at 317. This basic legal tenet requires us to remand this case, where treating and examining source opinions were discounted for the wrong reasons, a mistaken belief that these medical statements were not opinions that needed to be considered on their merits.  Yet, while case law calls for a remand and further proceedings by the ALJ in this case, assessing this claim in light of this evidence, nothing in our opinion should be construed as suggesting what the outcome of that final and full analysis should be. Rather, that final assessment of the evidence must await a thorough consideration and development of this evidence on remand by an ALJ. Therefore, nothing in this

31

opinion should be deemed as expressing a view on what the ultimate outcome of any reassessment of this evidence should be. Rather, that task should remain the duty and province of the ALJ on remand.

## IV.   <u>**Conclusion**</u>

Accordingly, for the foregoing reasons, IT IS ORDERED that this case be REMANDED for further consideration of the Plaintiff's application.

An appropriate order follows.


<u>*/s/ Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge


DATED: August 26, 2022